UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES, )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>JOHN THOMAS HINES, )<br>)<br>    Defendant ) | No. 1:12-cr-00204-JAW |

**RECOMMENDED DECISION ON MOTION TO SUPPRESS STATEMENTS**

    John Thomas Hines is charged in an indictment dated December 13, 2012, with unlawful possession of firearms in violation of 18 U.S.C. § 922(g)(9). Hines seeks the suppression of statements he made and statement-equivalent conduct he engaged in during questioning by sheriff's deputies at his home. The deputies conducting the check did not give Hines a Miranda warning before questioning him and Hines maintains that he was effectively in custody because he was subject to certain conditions of probation at the time. The court referred the motion for report and recommended decision. For reasons that follow, I recommend that the Court deny the motion without a hearing.

**FACTUAL BACKGROUND**

    Hines asserts that his motion is based on police reports prepared by Waldo County Sheriff's Deputies Benjamin Seekins and James Porter and certain unspecified documents provided to him by the United States Attorney. (Motion to Suppress at 1, ECF No. 19.) He does not include factual statements based on his personal recollection of events. In opposition to the motion, the Government has submitted a declaration from Deputy Seekins; a declaration from Robert Cartier, Hines's probation officer; a copy of the Waldo Superior Court order imposing

conditions of probation; and a copy of the affidavit filed in Superior Court in support of a determination that there was probable cause to find that Hines violated the conditions of his probationary sentence. (ECF No. 21-1, 21-2, 21-3, and 21-4.) The government observes that Hines has not filed an affidavit in support of his motion or otherwise provided the court with any evidence in support of the motion. (Gov't Opposition at 5, ECF No. 21.) In his reply Hines states that, if this was in fact a shortcoming, "the government has remedied it." (Reply at 1 n.1, ECF No. 22.) Based on this exchange, I conclude that Hines does not dispute the description of the encounter supplied by Deputy Seekins and that there is no reason to hold an evidentiary hearing to establish the facts and circumstances that transpired on March 21, 2012. United States v. Allen, 573 F.3d 42 (1st Cir. 2009).

On March 21, 2012, Hines was subject to conditions of probation that required him to, among other things, "answer all questions by your probation officer and permit the officer to visit you at your home or elsewhere" and "submit to random search and testing for" alcohol and drugs. (Conditions of Probation ¶¶ 3, 15, ECF No. 21-1.)

The Declaration of Deputy Seekins is sworn to under penalty of perjury and the parties have effectively stipulated the accuracy of the account he gives. On March 21, 2012, Seekins received a complaint concerning Hines and called Probation Officer Robert Cartier to discuss the matter. (Seekins Declaration ¶ 3.) Cartier informed Seekins that Hines was on probation subject to conditions and requested that Seekins perform a "probation check." (Id.) Seekins and Deputy Porter proceeded to Hines's residence together, in separate patrol cars. (Id. ¶¶ 2, 3.) Seekins and Porter were familiar with Hines and his residence because they had made multiple visits to the residence in the past. Seekins had responded to a complaint in which Hines was a victim and

had also arrested him in the past, though most of his contacts with Hines did not result in an arrest. (Id. ¶ 2.)

Seekins and Porter drove to the Hines residence in daylight hours and arrived in separate, marked police cruisers. They approached the front porch of Hines's house where Hines and his adult son, Dalton, were seated in chairs on the front porch. Seekins observed Hines place something under his chair when they pulled in. Seekins and Porter were in uniforms and each was armed with a holstered pistol. They approached and Seekins explained that they were visiting in order to make a probation check and asked Hines if he was on probation. Hines acknowledged that he was. Seekins told Hines that one of the conditions was that Hines not possess alcohol and he pointed out that Hines had a can of beer under his chair and was in violation. (Id. ¶ 4.)

Seekins states that Hines was uncharacteristically cooperative and forthcoming on March 21, despite prior occasions when he had presented a more confrontational attitude. (Id. ¶ 5.) Seekins then stated to Hines that another condition prohibited Hines from possessing firearms, whereupon Hines volunteered that he had firearms in his home but had been trying to get his brother to remove them ever since his conviction. (Id.) Seekins asked Hines where the guns were located and Hines responded that they were in the bedroom and he walked Seekins and Porter into the house and provided Seekins with a key to a cabinet. Seekins used the key and removed four firearms that are the basis for the pending federal prosecution. (Id. ¶ 6.) During this interaction, Seekins did not order or instruct Hines as to what he must do and did not tell him where to stand or block him from entering his home. (Id. ¶ 5.)

Seekins says he did not provide Hines with a Miranda warning because Hines was at his home and was not in custody. Neither Seekins nor Porter made any promises to Hines or

"enter[ed] his personal space." (Id. ¶ 7.) They did not brandish their weapons, subject Hines to a pat down search, handcuff him, or place him in a patrol car until sometime after Hines revealed the firearms to them. (Id.) They did not restrain, touch, arrest, threaten, attempt to trick, raise their voices, tell Hines he had to answer, tell him he could not leave their presence, or do anything suggesting an intention to make an arrest until after the firearms were revealed. (Id. ¶¶ 7, 8, 9.) The encounter was conversational in tone. (Id. ¶ 7.) Throughout the encounter, everyone present was calm. (Id. ¶ 8.) The encounter lasted approximately 25 minutes. (Id. ¶ 9.) Seekins and Porter decided to arrest Hines after reporting what they found to Hines's probation officer, who requested that they detain Hines on the basis of a probation violation. (Id.) Neither Seekins nor Porter provided Hines with a Miranda warning.

## DISCUSSION

Hines argues that he was entitled to a Miranda warning because, as a probationer subject to mandatory intrusions into his home, and as a probationer standing before an officer who had just observed a probation violation (the beer), it was reasonable for him to conclude that he was in custody for a probation violation. (Motion at 5-6.) In his own words:

> Mr. Hines was on the porch of a home that was familiar to him. It was daylight. The only restraint placed upon the defendant was verbal. The questioning was relatively short. Other factors, however, outweigh these and demonstrate that Mr. Hines was in custody at the time of the questioning.
>
> The officers initiated the encounter and informed Mr. Hines that they were there to conduct a probation check. The focus of their initial contact was solely on probation conditions and how Mr. Hines had violated those conditions. D/S Seekins almost immediately informed Mr. Hines that he observed beer which was probable cause to arrest for a probation violation. That deputy then informed Mr. Hines that he had, in fact, violated his conditions of probation. Following that statement D/S Seekins then inquired about firearms and weapons. At this point any reasonable person in Mr. Hines shoes would conclude that he was in custody for violating conditions of probation. Miranda warnings were required at this point.

4

(Id.)  Hines requests that his statements be suppressed, as well as any testimony related to "non-verbal communication such as leading the deputies to the gun cabinet and giving them the key to the cabinet."  (Id. at 6 (citing Pennsylvania v. Muniz, 496 U.S. 582, 595 n.9 (1990) (explaining that "nonverbal conduct contains a testimonial component whenever the conduct reflects the actor's communication of his thoughts to another")).

The government responds that Hines fails to demonstrate a custodial scenario because he was in the comfort of his own home and because of the non-confrontational nature of the encounter.  The government also emphasizes that Hines effectively volunteered the existence and location of the guns without being directly questioned about them.  (Gov't Response at 7-8 & n.5, ECF No. 21.)  In the government's view, the fact that the officers were carrying out a relatively informal probation check in the defendant's home weighs against a finding of a custodial scenario.  (Id. at 9 & n.9 (collecting cases).)

In reply, Hines contends that his probationary status should actually weigh in his favor because he was deprived of the authority to deny entry to the officers and could not simply ask them to leave.  He notes that Seekins announced at the outset that there was probable cause to arrest based on the presence of alcohol and says that this announcement altered the playing field and effectively imposed a level of restraint on him that was equivalent to an arrest.  (Reply at 2-3, ECF No. 22.)  Hines cites Minnesota v. Murphy, 465 U.S. 420 (1984), in support of this position.  Hines says that a reasonable person in his shoes would have felt arrest was imminent and that his uncharacteristically cooperative demeanor is a reflection of this fact.  (Id. at 3 & n.2.)

A.     **Burdens of Proof**

The parties agree that the burden of proving that Hines was in custody falls on Hines. (Motion at 4; Gov't Response at 5.)  Hines cites United States v. Charles, 738 F.2d 686, 692 (5th Cir. 1984).  The government cites Charles as well, and also United States v. Aguirre, 839 F.2d 854, 859 (1st Cir. 1988).  Aguirre holds that the defendant has the burden to demonstrate a legitimate expectation of privacy in order to show standing to pursue a motion to suppress. Aguirre, 839 F.2d at 859-60.  Aguirre is therefore not on point.

My research does not uncover a First Circuit opinion that expressly assigns the burden to the defendant to demonstrate a custodial scenario.[1]  Charles, however, is persuasive authority in support of the burden assignment proposed by the parties, as is United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989) (affirming district court's dismissal of defendant's Miranda claim because defendant "failed to demonstrate that he was subjected to custodial interrogation").  In any event, in this particular case, the parties have essentially stipulated what the facts are. Because there are no factual disputes, it is a legal question that the court is presented with;  "an objective inquiry" based on "all of the circumstances surrounding the interrogation." J. D. B. v. North Carolina, 131 S. Ct. 2394, 2402 (2011) (quoting Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam)).

B.     **Miranda and Custodial Interrogation**

In Miranda v. Arizona, the Supreme Court established "rules of police procedure applicable to 'custodial interrogation.'" Oregon v. Mathiason, 429 U.S. 492, 494 (1977).  It held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural

---

[1] The state practice is to place the burden on the government. State v. Hewes, 558 A.2d 696, 698 (Me. 1989) ("On a motion to suppress, the State has the burden of proof to demonstrate by a preponderance of the evidence that a suspect was either not in custody . . . or not under interrogation.") (citation omitted).

safeguards effective to secure the privilege against self-incrimination." Miranda, 384 U.S. 436, 444 (1966). The Miranda warning was deemed necessary to combat the "'compelling pressures' inherent in custodial police interrogation" and safeguard the Fifth Amendment. Dickerson v. United States, 530 U.S. 428, 440 (2000) (quoting Miranda, 384 U.S. at 467). For Miranda warnings to be required there must be a custodial scenario. Non-custodial questioning does not require a warning. Mathiason, 429 U.S. at 495; United States v. Quinn, 815 F.2d 153, 160 (1st Cir. 1987). For a suspect to be in custody, he must be subject to either formal arrest or an equivalent restraint on his freedom of movement. California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam); Mathiason, 429 U.S. at 495. The restraint imposed on a suspect's movement need not be physical. Custody may arise where the suspect is "otherwise deprived of his freedom of action in any significant way," including through the imposition of psychological pressures. United States v. Rogers, 659 F.3d 74, 77 (1st Cir. 2011) (quoting Miranda, 384 U.S. at 444). "Significant deprivation occurs in circumstances carrying a 'badge of intimidation,' or 'inherent compulsions,'" id. (quoting Miranda, 384 U.S. at 457, 467), "or as the Supreme Court later put it, in circumstances that 'blur[] the line between voluntary and involuntary statements, and thus heighten[] the risk' that the Fifth Amendment privilege will not be appreciated," id. (quoting Dickerson, 530 U.S. at 435).

"To ascertain whether someone was in custody for Miranda purposes, a district court 'examines the circumstances surrounding the questioning and then it sees whether those circumstances would cause a reasonable person to have understood his situation to be comparable to a formal arrest.'" United States v. Murdock, 699 F.3d 665, 669 (1st Cir. 2012) (quoting United States v. Guerrier, 669 F.3d 1, 6 (1st Cir. 2011)). "Several factors guide this analysis, including '(without limitation) where the questioning occurred, the number of officers,

the degree of physical restraint, and the duration and character of the interrogation.'" Guerrier, 669 F.3d at 6 (quoting United States v. Teemer, 394 F.3d 59, 66 (1st Cir. 2005)).  "[T]he ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  Beheler, 463 U.S. at 1125 (quoting Mathiason, 429 U.S. at 495).  To assist in this task, courts may consider "whether a reasonable person in the circumstances would have felt 'at liberty to terminate the interrogation and leave.'"  Rogers, 659 F.3d at 77 (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995));  see also J. D. B. v. North Carolina, 131 S. Ct. at 2402.  If not, then the follow-up inquiry is "whether those circumstances would have been likely to coerce a suspect to engage in back and forth with the police, as in the paradigm example of traditional questioning."  Rogers, 659 F.3d at 77 (quoting Berkemer v. McCarty, 468 U.S. 420, 436-37 (1984)).

Based on the totality of the circumstances, despite the conditions of probation that Hines was subject to, a reasonable person in Hines's position would not have felt obliged to engage in a dialogue with the deputies and would have felt free to disengage and leave it to the deputies to decide what, if anything, they intended to do about it.  Hines says that any reasonable probationer would have felt unable to disengage from Seekins and Porter because Seekins had expressed the view that Hines had violated his probation by drinking beer.  It is true that most people likely would find it difficult to break away entirely from an officer under these circumstances, but they would not reasonably conclude that they could not move about their premises and brush off interrogation.  Hines suggests he had no choice but to stay put and supply information because of the court order imposing conditions on his probationary sentence, but the order did not impose an obligation to answer questions presented by any and all law

8

enforcement. It required only that he answer all of the questions put to him by his probation officer.

Probationer status, in itself, does not impose a restraint of a degree associated with a formal arrest and a reasonable person would not feel bound to the degree associated with a formal arrest. A probationer would be in a position somewhat similar to the stopped motorist in Berkemer v. McCarty, who was in fact seized when he was questioned. As in the detained motorist scenario, the question is whether the person "is subjected to treatment that renders him 'in custody' for practical purposes." 468 U.S. at 440. The fact that a suspect is on probation and might not feel free to break off all communication does not mean that he would feel coerced to engage in a dialogue, let alone pressured to give any particular answer. Nor would it make him feel "completely at the mercy of the police." Id. at 438. The probationer might not feel the same degree of liberty as the non-probationer, but his probationary status would not reasonably justify feeling constrained to a degree associated with formal arrest.

Turning to the factors that inform the custody analysis: the questioning here occurred in neutral or better surroundings for Hines, as Hines was in his own home accompanied by a his adult son; the number of officers was not intimidating; there was no imposition of physical restraint or any threatening conduct; the duration of the encounter was not excessive at a mere 25 minutes; and the character of the "interrogation" was conversational. All of these factors indicate a scenario falling well short of the standard required to demonstrate that Hines was effectively "in custody."[2] Finally, although Seekins indicated that Hines was in violation of his probation for drinking beer, Seekins did not express an intention to arrest Hines on that basis. "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in

---

[2] "Even when questioning occurs in the stationhouse, a suspect need not be given Miranda warnings if he went there voluntarily and there was no such restriction on his freedom as to render him in custody." Quinn, 815 F.2d at 160 (internal quotation marks omitted).

9

custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Id. at 441. The fact that Seekins had discretion to arrest for a probation violation did not give rise to a custodial situation any more than in other cases where probable cause to arrest exists. E.g., United States v. Baumwald, 720 F. Supp. 226, 235 (D. Me. 1989). Although it was reasonable for Hines to feel in jeopardy of arrest because the officer voiced the fact of the violation, an arrest is not mandatory and Seekins did not express an intention to arrest or demonstrate any change in attitude or behavior towards Hines's freedom of movement after he noted the violation.

In Minnesota v. Murphy, the Supreme Court overturned a ruling by the Minnesota Supreme Court that suppressed statements made by a probationer (Murphy) to his probation officer when Murphy was subject to a court order requiring him to be truthful with the probation officer in all matters. 465 U.S. at 423-25. Murphy went to see his probation officer at her request and she told him that a counselor informed her that Murphy confessed to a rape and murder during a counseling session. Murphy admitted it was true but was never warned of his Miranda rights. Id. at 423-24. The Supreme Court began its discussion with the observation "that the general obligation to appear and answer questions truthfully did not in itself convert Murphy's otherwise voluntary statements into compelled ones." Id. at 427. Construing a meeting with a probation officer as a form of "proceeding," the Court noted that the Fifth Amendment combats official compulsion and does not preclude a person from giving voluntary incriminating testimony. Id. Witnesses in proceedings, in effect, must assert their fifth amendment privilege if they mean to do so and Miranda warnings are not required before eliciting incriminating testimony. Id. at 429. An order to be truthful with a probation officer does not deny a probationer the freedom to choose when it comes to admitting, denying, or

refusing to answer.  Id.  The Court held that Miranda does not automatically apply in the probation office setting because meetings with probation officers do not normally involve "inherently compelling pressures" or "overbearing compulsion . . . caused by isolation of a suspect in police custody."  Id. at 430 (quoting Miranda, 384 U.S. at 467, and United States v. Washington, 431 U.S. 181, 187 n.5 (1977)).  In a footnote the Court observed that Murphy was not under arrest and was free to leave at the end of his meeting with the probation officer, but that it would be different if Murphy "had been interviewed by his probation officer while being held in police custody or by the police themselves in a custodial setting."  Id. n.5.

  Hines suggests that the fifth footnote in Murphy changes the playing field for probationers, but in fact it supports the conclusion that the custody analysis is what matters, not probationary status.  The Court made this point plain in the body of its opinion when it observed that the Miranda concept of custody is not merely about legal restrictions and conditions placed on liberty, but on "the narrower standard" that involves formal arrests or equivalent restraints on freedom of movement.  Id. at 430;  see also United States v. Nieblas, 115 F.3d 703, 705 (9th 1997) (involving probation office interview);  United States v. Andaverde, 64 F.3d 1305, 1310 (9th Cir. 1995), cert. denied, 516 U.S. 1164 (1996) (same);  United States v. Hemphill, No. 1:10-CR-053, 2010 U.S. Dist. Lexis 94392, *9, 2010 WL 3366137, *3 (S.D. Ohio Aug. 20, 2010) ("Miranda's application is therefore similar in the probationary and non-probationary settings: the necessity of Miranda warnings turns on whether an individual is subjected to a custodial interrogation.").  Here, Hines was in a position much preferable to the probationer in Murphy because Hines was in his own home, not in the officers' domain, and Hines did not face an

accusation of rape and murder, but of drinking beer.  A reasonable person would not feel a restraint equivalent to a formal arrest under these circumstances.[3]

## CONCLUSION

For reasons set forth above, I RECOMMEND that the court DENY the defendant's motion to suppress (ECF No. 19).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

March 1, 2013

---

[3] In Rogers, the First Circuit held that a naval officer was subjected to custodial interrogation in his home when he was ordered by his commanding officer to report to his home, where law enforcement was waiting to question him.  The Court observed that "the most significant element in analyzing the situation is that the military had made certain that Rogers did not walk into it voluntarily, or confront the police with free choice to be where he was."  659 F.3d at 78.  The Rogers Court made it clear that the military command structure and the psychological pressure it placed on the officer were the driving forces behind its holding.  Id. at 78-79.  In light of Murphy, it cannot be said that an order imposing conditions of probation exerts comparable psychological pressure.